**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| KORY MAXFIELD, | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, SEAN McDERMOTT, | ) | |
| ZACHARY RUBALD, J.G. HARRIS, and | ) | |
| PHILIP STRAZZANTE, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| *Defendants*. | ) | |

## COMPLAINT

Plaintiff, KORY MAXFIELD, by his counsel, LOEVY & LOEVY, complains against

Defendants CITY OF CHICAGO, SEAN McDERMOTT, ZACHARY RUBALD, J.G. HARRIS,

and PHILIP STRAZZANTE, states as follows:

### INTRODUCTION

1.      In May of 2012, Jason Coleman and Nelly Cabrera were the victims of an armed

robbery. Two men approached them in their car, held them up at gunpoint, and made off with

cash, jewelry, and a cell phone.

2.      Plaintiff Kory Maxfield was wrongfully convicted of the robbery in 2017.

3.      Plaintiff had nothing to do with the robbery. Mr. Maxfield is innocent, and he

was convicted solely because Defendants framed him.

4.      Defendants snatched Plaintiff at random off the street, inculpated him based on a

fabricated identification they manipulatively elicited from one victim, ignored exculpatory

evidence, and lied about their investigation.

5.     Plaintiff was not acting suspiciously in any way—he was merely walking through the neighborhood—but Defendants detained him because he was the closest convenient Black man onto whom they could arbitrarily pin responsibility.

6.     The victims had not communicated any information to police about the perpetrators' height, weight, clothing, or any characteristic apart from that there were two Black males involved. No more than this was communicated at the time.

7.     It was in this context that Defendants plucked Plaintiff off the sidewalk at random, searched him, found nothing, and brought him before the victims anyway, pressuring the victims to confirm that their wild and uninformed detention of Mr. Maxfield was justified.

8.     Even though one of the victims declined to identify Mr. Maxfield, Defendants pressed ahead.

9.     After Defendants improperly convinced one victim to agree with them, they offered Plaintiff's property to the victims, suggesting Plaintiff's own belongings were proceeds of the robbery.  That was a lie.  But on the basis of their lie and their identification, Defendants arrested Mr. Maxfield.

10.     As a result of Defendants' manipulation of the victims, lies about Plaintiff, and misconduct throughout trial, Mr. Maxfield was convicted and sentenced to a 21-year term in prison for a robbery in which he was not involved, along with a concurrent 7-year term in prison for unlawful use of a weapon he never possessed.

11.     More than 11 years after Plaintiff's arrest, the Appellate Court of Illinois vacated the conviction because "the totality of these circumstances was insufficient to provide the reasonable, articulable suspicion to stop [Plaintiff] Maxfield." This case is filed within two years of the  ultimate final invalidation  of the conviction.

12.     Plaintiff now seeks justice for the loss of his liberty and terrible hardship he endured and continues to suffer because of Defendants' misconduct.

## JURISDICTION AND VENUE

13.     Plaintiff brings this action under 42 U.S.C. § 1983 and Illinois law to redress the defendants' tortious conduct and their deprivation of his rights secured by the U.S. Constitution.

14.     This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over his state-law claims under 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b) because Plaintiff lives in this judicial district and the events and omissions giving rise to his claims, including the investigation, prosecution, and trial resulting in Plaintiff's conviction, happened here.

## PARTIES

16.     Plaintiff Kory Maxfield lives in Chicago. He spent more than 11 years wrongfully imprisoned for a robbery he did not commit.

17.     At all relevant times, Defendants Rubald, Harris, Strazzante, and McDermott were officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago. Plaintiff sues each of these Defendants in their individual capacity.

18.     The City of Chicago is an Illinois municipal corporation that employs or employed the above-named defendants. At all relevant times, each individual defendant acted as an agent or employee of the City.

## FACTS

### The Robbery of Jason Coleman and Nelly Cabrera

19.     On May 2nd, 2012, Jason Coleman and Nelly Cabrera were sitting in their parked car when two men approached them and demanded money at gunpoint.  The thieves stole cash, jewelry—notably a silver chain with a cross—and a cell phone, and they escaped in a white minivan.

20.     Mr. Coleman and Ms. Cabrera flagged down a passing patrol car belonging to Officers Philip Strazzante and Sean McDermott and told them about the robbery and the white minivan.  But the victims could provide no description of the thieves beyond that the perpetrators had a "big old silver handgun".

21.     Shortly thereafter, Officers Strazzante and McDermott came upon a white minivan stopped in traffic. When they approached, the minivan peeled out of traffic, colliding with a number of stopped cars.  Somebody in the minivan pointed a gun at Officer Strazzante, who fired eight shots into the back of the fleeing van as it escaped.  Strazzante could not and did not describe anybody inside the minivan.

22.     In the meantime, dispatchers notified local police of the robbery, the escaped white minivan, and the shots fired, noting over radio that "we don't have a description at this time".

23.     Zachary Rubald was one of the officers responding to this dispatch.

### Officer Rubald Arbitrarily Detains Mr. Maxfield

24.     Minutes later and several blocks away, Officer Rubald, in plain clothes, approached Mr. Maxfield as he walked out of an alley toward Officer Rubald's marked patrol

car.  Rubald and his partner Officer Harris immediately stopped Mr. Maxfield, searched his person, and cuffed him.

25.     Rubald and Harris had no description to compare to Mr. Maxfield, and therefore no basis whatever to single him out, other than that Mr. Maxfield was a Black man out walking in public on a warm Spring night.

26.     Officer Rubald singled Mr. Maxfield without regard for whether Mr. Maxfield was actually involved, intending to manipulate others into corroborating this arbitrary detention later.

27.     Mr. Maxfield did not attempt to flee or resist arrest because he knew he had done nothing wrong.

### Defendants Fabricate a False Identification

28.     Officer Rubald brought Mr. Maxfield to Mr. Coleman and Ms. Cabrera as part of a "show-up" alongside another suspect. Police asked Mr. Coleman and Ms. Cabrera, "Are these the people that robbed you?"  As a result of this improper procedure, Mr. Coleman agreed to identify Mr. Maxfield as the perpetrator, but Ms. Cabrera did not.

29.     As part of this improper procedure, Rubald presented Mr. Maxfield's own silver chain to Mr. Coleman and Ms. Cabrera, and Mr. Coleman incorrectly claimed that it was his own chain that had just been stolen.  At the same time, Mr. Coleman also claimed that Mr. Maxfield's cash was his own, even though Mr. Maxfield was carrying a different sum to the one Mr. Coleman said was stolen.

30.     In this way, Officer Rubald effectively incentivized Mr. Coleman to identify Mr. Maxfield, and thereby help him close his case.

31.     Officer Rubald's unjustified stop of the first convenient Black man in his path, Mr. Coleman and Ms. Cabrera's contradictory identifications/non-identifications, and Mr. Coleman's acceptance of Rubald's improper offer of a common-looking piece of jewelry led the Defendants to conclude their investigation and decide to push for Mr. Maxfield to be charged and tried with armed robbery.

**Defendants Suppress Their Investigative Misconduct**

32.     Defendants knew that the property they recovered from Mr. Maxfield's person was unrelated to the robbery. They lied about this in their reports and throughout the trial of Mr. Maxfield, as further described below.

33.     The false reports were used to cover up evidence of Defendants' misconduct. They were provided to state prosecutors and became the basis for charging and prosecuting Plaintiff.

34.     At all times, Defendants suppressed the true circumstances of their manipulative identification procedures and the provenance of the property in issue. They did not investigate Mr. Maxfield's assertions that the property he was carrying was his own, and they did not hesitate to continue to implicate Mr. Maxfield even though they knew they had no basis to detain him in the first place.

35.     Defendants did not disclose their misconduct to Plaintiff or his attorneys.

36.     Defendants also suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have shown Plaintiff's innocence.

**Mr. Maxfield's Wrongful Conviction and Imprisonment**

37.     As a result of Defendants' misconduct and based on the false evidence they manufactured, Defendants arrested Mr. Maxfield along with the other suspect for robbing Mr. Coleman and Ms. Cabrera at gunpoint.

38.     There was no weapon or other forensic evidence connecting Mr. Maxfield to the crime.

39.     Nevertheless, Mr. Maxfield was charged with armed robbery and related weapons charges.

40.     At trial, the State's case hinged entirely on the fabricated identifications of Plaintiff from the show-up, along with the property supposedly recovered from the robbery, neither of which could have occurred if not for Defendant Rubald's arbitrary, speculative, racially-informed decision to stop Mr. Maxfield.  Defendants misled the court and the State's Attorney's office concerning this evidence in an effort to secure the conviction and incarceration of an innocent man.

41.     Following the trial, the judge found Mr. Maxfield guilty.  The judge sentenced Mr. Maxfield to 27 years in prison.

42.     Without the illegal detention of Mr. Maxfield, the false identifications, and Defendants' lies, Plaintiff never would have been charged or convicted.

43.     The following years of Mr. Maxfield's life were consumed by the horror of an imprisonment for a crime he did not commit.

44.     Mr. Maxfield was deprived of all the basic pleasures of human experience that free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

45.     Mr. Maxfield never knew whether the truth would come out or whether he would be exonerated.

46.     Mr. Maxfield's suffering did not end with his release from prison.  Defendants' misconduct continues to cause Mr. Maxfield extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

### Mr. Maxfield's Exoneration

47.     Mr. Maxfield steadfastly maintained his innocence before his conviction, after his trial and after his release from prison.

48.     After spending more than 11 years behind bars for a crime he did not commit, Mr. Maxfield was released in 2024.  In overturning Mr. Maxfield's conviction, the Appellate Court of Illinois noted that there was no reasonable suspicion that could justify stopping Mr. Maxfield, no reasonable basis to suspect Mr. Maxfield of the robbery, and no justification for the presentation of this coerced, manipulative, dishonest evidence and testimony to the jury.

49.     At the time of his exoneration, Mr. Maxfield had been fighting the false charges against him for 12 years.

### Chicago's Policy and Practice of Wrongly Convicting Innocent People in Violation of the Constitution

50.     The City of Chicago and the Chicago Police Department are responsible, by virtue of their official policies, for inflicting miscarriages of justice in scores of criminal cases like Plaintiff's case.

51.     Since the 1980s, at least 100 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of innocent people for serious crimes they did not commit.

52.     In many of these cases, Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including but not limited to fabricating evidence, concealing exculpatory evidence, manipulating witnesses to influence identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction of a person without probable cause or regard for the person's actual guilt.

53.     At all relevant times, members of the Chicago Police Department, including Defendants in this action, routinely fabricated and manipulated identification procedures to procure suspect identifications they knew were inaccurate.

54.     At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the Chicago Police Department and never disclosed to criminal defendants, their attorneys, or state prosecutors. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather than being preserved as part of the official file.

55.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including Defendants, concealed exculpatory evidence from Plaintiff.

56.     The existence of this policy and practice of suppressing exculpatory or impeaching material in clandestine files was established and corroborated at trial in the cases of *Rivera v. Guevara*, No. 12-cv-4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10-cv-1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87-cv-2536 (N.D. Ill.), among others.

57. The policies and practices of file suppression exposed in *Fields* were in place from the 1980s through the 2010s, including at the time of the investigation at issue here.

58. Moreover, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime. No Chicago police officer has ever been disciplined for misconduct in any of those cases.

59. Before and during the period in which Plaintiff was falsely charged and convicted, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against officers accused of violating the civil and constitutional rights of members of the public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

60. Leaders of the Chicago Police Department and elected officials in Chicago have acknowledged a code of silence within the Chicago Police Department, condoned and facilitated by municipal policy makers and department supervisors. Under the code of silence, officers refused to report and otherwise lied about their colleagues' misconduct, including the kind of misconduct at issue in this case.

61. As a result of the City of Chicago's established practices, officers (including Defendants) have come to believe they may violate civilians' civil rights and cause innocent people to be charged with serious crimes without fear of adverse circumstances. The practices that enable this belief include failing to track and identify police officers repeatedly accused of serious misconduct, failing to investigate cases where police were involved in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code

10

of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

62.     This belief extends to Defendants in this case. They engaged in the described misconduct because they had no reason to fear the City of Chicago and its police department would ever discipline them for doing so.

63.     The City of Chicago and its police department also failed in the years before Plaintiff's wrongful conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

    a.  The conduct of live lineup, photographic, and other identification procedures;

    b.  The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and how to ensure such evidence is made part of the criminal proceeding;

    c.  The risks of wrongful conviction and the steps police officers should take to minimize risks;

    d.  The risks of engaging in tunnel vision during investigation; and

    e.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

87.     The need for police officers to be trained in these areas was and remains obvious to the City. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

11

88.     The City's failure to train, supervise, and discipline its officers, including the individual defendants in this case, condones, ratifies, and sanctions the kind of misconduct that Defendants committed against Plaintiff.

89.     The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

90.     The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described in this complaint.

91.     Indeed, Defendants engaged in the misconduct set forth in this complaint because they knew the City of Chicago and its police department tolerated and condoned such conduct.

**COUNT I**
**42 U.S.C. § 1983 – Violation of Due Process**
**(Fourteenth Amendment)**

92.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

93.     As described above, Defendants, while acting individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

94.     In the manner described above, Defendants made false statements falsely implicating Plaintiff in the crime.

95.     Defendants knew this evidence was false.

96. Defendants obtained Plaintiff's arrest and conviction using this false evidence, and they failed to correct fabricated evidence they knew was false when it was used against Plaintiff during his criminal case.

97. In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that Defendants had stopped Mr. Maxfield because of his race and coerced false identifications of Mr. Maxfield and his property from the victims, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

98. In addition, on information and belief, Defendants concealed, fabricated, and destroyed other evidence not yet known to Plaintiff.

99. Defendants also procured false identifications of Plaintiff, which they knew were unreliable, by using unduly suggestive procedures and telling victims to identify Plaintiff. Defendants caused the State to use those false identifications against Plaintiff at his criminal trial.

100. Defendants' misconduct caused Plaintiff's unjust and wrongful criminal prosecution and deprivation of liberty, violating his right under the Fourteenth Amendment to a fair trial. Absent Defendants' misconduct, Plaintiff's prosecution could not and would not have been pursued.

101. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and in total disregard of the truth and Plaintiff's clear innocence.

102. As a result of Defendants 'misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and

suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

103.    Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

**COUNT II**
**42 U.S.C. § 1983 – Malicious Prosecution and Unlawful Detention**
**(Fourth and Fourteenth Amendments)**

104.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

105.    As described above, Defendants individually, jointly, and in conspiracy with each other, and under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff.  They did so without any probable cause and despite knowing Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

106.    In so doing, Defendants maliciously prosecuted Plaintiff, caused Plaintiff to be deprived of his liberty without probable cause, and caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause.  These judicial proceedings were instituted and continued maliciously, resulting in injury.

107.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

108.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

14

109.    Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

## COUNT III
### 42 U.S.C. § 1983 – Failure to Intervene

110.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

111.    As described above, during the constitutional violations described in this complaint, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights.

112.    Defendants had ample, reasonable opportunities and the duty to prevent this harm but failed to do so.

113.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

114.    As a result of these Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

115.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count V.

## COUNT IV
### 42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights

116.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

117.    As described more fully above, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate

evidence, suppress evidence, and coerce identifications to detain, prosecute, and convict Plaintiff, without regard for Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

118.     In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means.  In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of those rights.

119.     In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

120.     The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

121.     As a result of Defendants 'misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

122.     Defendants undertook the misconduct described in this Count pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below.

## COUNT V
### 42 U.S.C. § 1983 – Municipal Liability Claim against the City of Chicago

123.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

124.     As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the City's policies, practices, and customs, as well as by the actions of policy-making officials for the City of Chicago.

125.     At all relevant times, and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; conducting interrogations and questioning criminal suspects; collecting, documenting, preserving, testing, and disclosing evidence; writing police reports and taking investigative notes; obtaining statements and testimony from witnesses; and maintaining investigative files and disclosing those files in criminal proceedings.  In addition, or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for training and supervising officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

126.     At all relevant times, and for a period of time before Plaintiff's wrongful conviction, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, like Plaintiff, were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using manipulated photographic or live lineup procedures.

127.     Specifically, at all relevant times and for a period of time before and after Plaintiff's wrongful conviction, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, including that officers: (1) did not record investigative information in police reports, maintain proper investigative files, or disclose investigative materials to prosecutors and criminal defendants; (2)

falsified witnesses 'statements and testimony; (3) fabricated false evidence implicating criminal defendants in criminal conduct; (4) failed to maintain or preserve evidence or destroyed evidence; and (5) pursued wrongful convictions through profoundly flawed investigations.

128.     These widespread practices, individually and together, were allowed to flourish because the City of Chicago's leaders, supervisors, and policymakers directly encouraged and were thereby the moving force behind the very type of misconduct that occurred in Plaintiff's case. They did this by failing to adequately train and supervise their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline past instances of similar misconduct, which directly encouraged future abuses like those affecting Plaintiff.

129.     The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, both individually and together, because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

130.     As a result of the City of Chicago's policies and practices, numerous individuals have been wrongly convicted of crimes they did not commit.

131.     Defendants undertook the misconduct described in this Count pursuant to the City of Chicago's policies and practices in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

132.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including the individually named defendants, who acted

pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VI
### State Law Claim – Malicious Prosecution

133.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

134.    As described above, Defendants individually, jointly, and in conspiracy with each other, and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

135.    In so doing, Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. Those judicial proceedings were instituted and continued maliciously, resulting in injury.

136.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in 2024.

137.    The misconduct described in this Count was objectively unreasonable and Defendants undertook the misconduct intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

138.    As a result of Defendants 'misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VII
### State Law Claim – Intentional Infliction of Emotional Distress

139.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

140.     Defendants 'actions, omissions, and conduct described above were extreme and outrageous.  Their actions were rooted in an abuse of power and authority.  And their actions were undertaken with the intent to cause, or with reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

141.     As a result of Defendants 'misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII
## State Law Claim – Willful and Wanton Conduct

142.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

143.     At all times relevant to this complaint Defendants had a duty to refrain from willful and wanton conduct.

144.     Notwithstanding that duty, Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

145.     As a result of Defendants 'misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX
## State Law Claim – Civil Conspiracy

146.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

147.     As described more fully in the preceding paragraphs, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose, to achieve a lawful purpose by unlawful means, or both. In

addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of his rights.

148.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

149.    The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

150.    The misconduct described in this Count was objectively unreasonable, and Defendants undertook the misconduct intentionally and in total disregard of the truth and Plaintiff's clear innocence.

151.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### State Law Claim – *Respondeat Superior*

152.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

153.    While committing the misconduct alleged in the preceding paragraphs, the individual defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

154.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

## COUNT XI
### State Law Claim - Indemnification

155.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

156.    Illinois law provides that public entities are directed to pay any tort judgment for

compensatory damages for which employees are liable within the scope of their employment activities.

157.    The individual defendants were employees, members, and agents of Defendant City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

158.    Defendant City of Chicago is responsible to pay any judgment entered against the individual defendants.

WHEREFORE, Plaintiff Kory Maxfield respectfully requests this Court enter a judgment in his favor and against Defendants CITY OF CHICAGO, SEAN McDERMOTT, ZACHARY RUBALD, J.G. HARRIS,  and PHILIP STRAZZANTE, awarding compensatory damages, attorneys''fees, and costs against each defendant, punitive damages against each individual defendant, and any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Kory Maxfield hereby demands a trial by jury under Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Jon Loevy

LOEVY & LOEVY
311 N. Aberdeen, 3rd FL
Chicago, IL 60607
(312) 243-5900
jon@loevy.com